**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| THOMAS K. MANNING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| ALAMANCE COUNTY, NORTH | ) | 1:15CV290 |
| CAROLINA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Thomas K. Manning has alleged that Defendant Alamance County,
North Carolina ("Alamance County" or "the County") wrongfully terminated his
employment in violation of public policy. (Compl. [Doc. #1].)  This matter is before
the Court on cross-motions for summary judgment by Alamance County [Doc.
#39] and by Manning [Doc. #47].  On June 21, 2017, a hearing was held on the
motions during which each motion was denied.  This Memorandum Opinion and
Order explains why.

I.

As an initial matter, Alamance County challenges the admissibility of two of
Manning's exhibits, an article in The Times-News, (Ex. G to Pl.'s Br. in Supp. of
Summ. J. ("Pl.'s Br. in Supp.") [Doc. #49]), and the determination of North
Carolina's Division of Employment Security ("ESC"), (Ex. K to Pl.'s Br. in Supp.).
(Def.'s Reply Br. at 4 [Doc. #56].)  The County argues that the newspaper article
in which its Board of Commissioners' then-Chair, David Smith, is quoted as saying

that Manning was "absolutely" and "involuntarily terminated" is inadmissible hearsay. (Id.)  On the other hand, Manning argues that the article is admissible either as a statement by a party opponent pursuant to Rule 801(d)(2)(A) of the Federal Rules of Evidence or for impeachment purposes pursuant to Rule 801(c)(2) of the Federal Rules of Evidence. (Pl.'s Reply Br. at 2-3 [Doc. #58].)

"[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." Md. Highways Contractors Ass'n, Inc. v. Md., 933 F.2d 1246, 1251 (4th Cir. 1991).  The admissibility of the newspaper article presents two levels of possible hearsay – the quoted statement and the article itself.  The quoted assertion purportedly made by Smith is a statement by a party opponent and, therefore, is not hearsay. Fed. R. Evid. 801(d)(2)(A) (providing that a statement is not hearsay when it is offered against an opposing party and was made by the party in a representative capacity, or by a person whom the party authorized to make a statement on the subject, or by the party's agent on a matter within the scope of that existing relationship).  However, the Fourth Circuit has repeatedly held that newspaper articles are inadmissible hearsay when presented for the truth of their contents. See Greene v. Scott, 637 F. App'x 749 (4th Cir. Feb. 11, 2016) (unpublished) (recognizing that that the mayor's statement as a party-opponent was not hearsay, but "the conveyance of that statement in the newspaper article [was] hearsay"); Gantt v. Whitaker, 57 F. App'x 141, 150 (4th Cir. 2003) (unpublished) (affirming the district court's striking of a newspaper article submitted by the plaintiff in response to the law enforcement defendants'

motion for summary judgment that contained statements allegedly made by one of the law enforcement defendants about the plaintiff's arrest). This is precisely the purpose for which Manning seeks to introduce the newspaper article – to prove that Smith made the statements attributed to him and that Manning had absolutely been involuntarily terminated.

Perhaps recognizing that the newspaper article is impermissible hearsay, Manning alternatively argues that he could use the newspaper article to impeach Smith's earlier statement that Manning had resigned. (Pl.'s Reply Br. at 3 (citing Fed. R. Evid. 801(c)(2)).) Fourth Circuit precedent suggests, though, that the newspaper article is also inadmissible for purposes of impeachment at trial. See United States v. Mathis, 550 F.2d 180, 182 (4th Cir. 1976) ("A newspaper article connecting a witness to a robbery was inadmissible hearsay, even for purposes of impeachment."). Moreover, for purposes of summary judgment, evidence must be admissible to prove the truth of the matter asserted. Impeachment evidence is not considered at this stage, so this argument as to the article's admissibility in support of Manning's summary judgment motion is unavailing.

Manning's seemingly unavoidable use of the newspaper to prove the truth of the matter asserted therein is further evident in his argument that the article is admissible under Rule 807's residual exception. (Pl.'s Reply Br. at 3 (explaining that he could cure the hearsay problem by calling the newspaper reporter to testify, but, in the reporter's absence, the article is admissible under Rule 807).) Among other things, he contends that he would offer the article "as evidence of a

material fact (that Manning was terminated)". (Id.)  Under these circumstances, the newspaper article is inadmissible hearsay and will not be considered for purposes of the summary judgment motions.

Alamance County next argues that the determination of the North Carolina Division of Employment Security is inadmissible according to North Carolina statute. (Def.'s Reply Br. at 4 (citing N.C. Gen. Stat. § 94[sic]-4(x)(8)).)  Manning argues that because the sub-heading of § 96-4(x)(8) is entitled "Confidentiality of Records, Reports, and Information Obtained from Claimants, Employers, and Units of Government", only the ESC is limited in its ability to disclose certain statutorily defined confidential information. (Pl.'s Reply Br. at 3-4.)  He concedes that the ESC's determination is not binding on this Court, but contends that he has authority to disclose the protected information and that such information is "further impeachment of Defendant's contentions". (Id. at 4.)

While much of § 96-4(x) is designed to protect statutorily defined confidential information, § 96-4(x)(8) reads in full:

> Any finding of fact or law, judgment, determination, conclusion or final order made by the Assistant Secretary, the Board of Review, a hearing officer, appeals referee, or any other person acting under authority of the Division pursuant to the Employment Security Law is not admissible or binding in any separate or subsequent action or proceeding, between a person and his present or previous employer brought before an arbitrator, court or judge of this State or the United States, regardless of whether the prior action was between the same or related parties or involved the same facts.

(emphasis added).  Although the Federal Rules of Evidence presumably govern the admissibility of evidence in diversity actions, "a federal court may

apply a state evidentiary rule that embodies or is closely tied to a state substantive policy." Smith v. Computer Task Grp., Inc., 568 F. Supp. 2d 603, 611 (M.D.N.C. 2008) (citing Scott v. Sears, Roebuck & Co., 789 F2d 1052, 1054 (4th Cir. 1986) & Hottle v. Beech Aircraft Corp., 47 F.3d 106, 109-10 (4th Cir. 1995)).  In Smith, the plaintiff alleged, among other things, that the defendant wrongfully terminated him. Id. at 606.  In opposition to the defendant's motion for summary judgment, the plaintiff relied in part on a determination by the ESC granting him benefits following his termination. Id.  The court concluded that then-§ 96-4(t)(8)[1] "plainly renders inadmissible the ESC Decision and any reference to it in Smith's response to the Motion for Summary Judgment." Id. at 611.  Therefore, here, as in Smith, the ESC's determination as to Manning is inadmissible.

## II.

It is undisputed that, beginning in January 2014, Manning was employed as the Alamance County Finance Officer after having served as a member and chair of the County's Board of Commissioners ("Board"). (Thomas K. Manning Dep. (Dec. 19, 2016) 14:3-9, 14:24-15:3, 15:19-24, 18:23-19:6, 24:19-20 (Ex. A to Pl.'s Br. in Supp.).)  In this position[2], Manning supervised eight employees, seven of

---

[1] The statutory language quoted in Smith is verbatim the language in current § 96-4(x)(8).

[2] Although Manning explains in his brief in support of summary judgment that his duties included "approval and payment of bills, invoices, or other claims against the local government or public authority", (Pl.'s Br. in Supp. at 2), there is no evidence in support of this job description.  Manning cites to Alamance County's

whom were women[3] and one of whom was a man, Purchasing Manager Randy Clark who still holds that position. (Id. 21:15-22:11, 35:4-5; Susan Roberts Decl. (Mar. 28, 2017) ¶ 4 [Doc. #41].)

## A.

In 2014, Alamance County had an agreement with Steve's Garden Market for the provision of food to the inmates in the County Detention Center ("jail"). (See Timothy J. Britt Decl. ¶¶ 6, 7, 9 and Ex. B (Mar. 29, 2017) [Doc. #40].) That summer, Purchasing Agent Clark sought legal guidance from Norma Houston at the University of North Carolina's School of Government on the purchase of food for the County jail. (See Emails between Clark & Houston, June 23, 2014 (Ex. C to Compl. [Doc. #1]); Ex. D to Pl.'s Br. in Supp.) Around that same time, Clark approached Manning concerned that there was no written contract with Steve's Garden Market and that the provision of these services had not been through the bidding process. (Manning Dep. 31:4-9, 33:4-11.) Accordingly, Manning, Clark, and Chief Deputy Tim Britt worked together to develop guidelines and sent out requests for proposals. (Id. 31:11-19, 33:13-22; see also Draft Invitation for Bids, Aug. 8, 2014 (Ex. A to Compl.).) In September, Clark forwarded the County

---

Response to Interrogatory Number 2, attached to his brief as Exhibit B. Its Response reads "Plaintiff had a written job description. This written job description is attached." However, as presented to the Court, no written job description is attached to Alamance County's Interrogatory Responses.
[3] The parties have entered into a Protective Order [Doc. #33] pursuant to which the names of the female employees have been filed under seal. Accordingly, the Court will refer to these employees by number, instead of name.

Attorney, Clyde Albright, Houston's advice that the food purchases for the jail were subject to competitive bidding requirements. (Email from Clark to Albright, Sept. 10, 2014 (Ex. D. to Pl.'s Br. in Supp.).) The following month, Clark forwarded the same guidance from Houston to Manning. (Email from Clark to Manning, Oct. 3, 2014 (Ex. C to Compl.).) Manning then discussed the matter with Albright who refused to take the issue before the full Board. (Resp. 4 to Def.'s Reqs. for Admiss. (Ex. E to Pl.'s Br. in Supp.).)

During this time, though, the County never stopped paying for food, but it informed the vendor that there would be requests for proposals as required under the law. (Manning Dep. 32:15-22.) However, then-Board Chair Smith instructed Clark to cancel the invitation for bids, which Clark did on October 6. (Id. 31:21-25; Bid Cancellation Notice, Oct. 6, 2014 (Ex. C to Pl.'s Br. in Supp.).) Manning was not in a position to refrain from signing the checks for the food vendor because the inmates needed to be fed, but he was working toward a solution that he believed would comply with the law. (Checks to Steve's Garden Mkt., Oct. 6, 2014, Oct. 29, 2014, Nov. 5, 2014 (Ex. A to Answer [Doc. #24]); Resps. 4 & 5 to Def.'s Reqs. for Admiss.) Ultimately, on July 20, 2015, the North Carolina General Assembly ratified Session Law 2015-156 exempting the Alamance County Sheriff's Office, among other counties' sheriffs' offices, from the formal bidding requirements of North Carolina General Statute § 143-129 when purchasing food and food services supplies; however, neither party has provided evidence of the

General Assembly's motivation for ratifying this Session Law or the significance, if any, of such action on Manning's claims here. (Ex. B to Answer.)

B.

Sometime after Clark initially approached Manning about the provision of food for the County jail, Clark expressed concern to Manning about the purchase of Sheriff's Department vehicles. (Manning Dep. 24:25-26:25.) He brought Manning purchase orders that the Sheriff's Department had presented to him for approximately $282,000 worth of vehicles to be purchased from Nichols Dodge, a local dealership, but that he believed had not been through the requisite bidding process. (Id. 25:1-19; see also Requisition, Oct. 3, 2014 (Ex. E to Compl.).) Clark and Manning met with the County Manager, Craig Honeycutt, about the vehicle purchase, and he agreed that it needed to be "process[ed] . . . up" and that he would speak to the Sheriff. (Manning Dep. 27:1-5.)

In October, Clark reached out to Houston once again for legal guidance, this time about the vehicle procurement issue and Public Contract Law in general. (Emails citing N.C. Gen. Stat. §§ 143-129 & 159-28 between Houston and Clark, Oct. 7, 2014, Oct. 13, 2014 (Ex. A-1 to Manning Dep., Ex. D to Pl.'s Br. in Supp., Ex. A to Albright Decl. (Mar. 29, 2017) [Doc. #43]).) He forwarded Manning her responses, which Manning then forwarded to Albright and Honeycutt. (Email citing N.C. Gen. Stat. §§ 143-129 & 159-28 from Manning to Albright & Honeycutt, Oct. 13, 2014 (Ex. A-1 to Manning Dep., Ex. A to Albright Decl.).) Houston explained that the office of the sheriff was subject to the same bidding,

8

contracting, and finance laws as any other county department and all contracts into which the sheriff entered had to comply with state competitive bidding and pre-audit requirements. (Email from Houston to Clark, Oct. 13, 2014 (Ex. A-1 to Manning Dep.).)  According to Houston, a contract that did not fully comply with the competitive bidding or pre-audit requirements was void and unenforceable and subjected the employee making a payment under such contract to liability against the bond. (Id.)

Albright responded twice to Manning, first on October 13 and next on October 14. (Email from Albright to Manning, Oct. 13, 2014 (Ex. A to Albright Decl.); Email from Albright to Manning, Oct. 14, 2014 (Ex. A-1 to Manning Dep.).) Albright distinguished this situation from a previous problematic expenditure and explained, among other things, that "[t]he existence of a pre-audit certification, required by Chapter 159, indicates that there is money budgeted to pay for the contract and I believe that there is no question that funds have been budgeted", that "[t]he spirit of the law was followed, if not the letter of the law", and that, "[i]n the future we can work to be more attentive to the vehicle and equipment requests to ensure the law is followed as best as possible." (Email from Albright to Manning, Oct. 14, 2014.)  Albright also questioned, "At the end of the day . . . what is the harm to taxpayers?" because the vehicles were purchased below the state contract rate and local dealer informal quotes and the local dealers would benefit from the sale and service of the vehicles. (Id.)  In response to Houston's warning of personal liability, Albright asked "who is going to file this lawsuit?

There are no damages since the vehicles were purchased below the state contract rate." (Id.)  He determined that, as the County Attorney, he would not bring the issue before the Board because he believed it was best handled by the County Manager and the Sheriff. (Id.)

Approximately two weeks later, on October 24, Albright issued a memorandum to Manning in which he analyzed whether the Sheriff's vehicle purchase met the disbursement requirements of Chapter 159 of the North Carolina General Statutes and concluded that it had because there was a payable invoice and the County had included an appropriation in the Sheriff's budget to purchase vehicles, for which there were sufficient funds remaining. (Mem. from Albright to Manning, Oct. 24, 2014 (citing N.C. Gen. Stat. § 159-28(b)) (Ex. J to Pl.'s Br. in Supp.).)  He also explained that Manning's obligations as the Finance Officer when presented with a bill, invoice, or other claim did not require, nor was it advisable for, Manning to make any determination regarding the contract that gave rise to the invoice. (Id.)

Four days later, on October 28, Smith sent Manning a memorandum in which he explained that he was aware of Manning's refusal to disburse the funds for the Sheriff's vehicle purchase and instructed Manning to do so as required, which Manning did the following day. (Mem. from Smith to Manning, Oct. 28, 2014 (Ex. F to Pl.'s Br. in Supp.); Check to Nichols Dodge, Oct. 29, 2014 (Ex. A to Answer).)  According to Manning, though, no one threatened his employment when he initially refused to sign the checks, (Manning Dep. 30:18-21), and Clark

10

still holds the position of Purchasing Manager despite Albright's considering him to be more vocal about these issues than Manning, (Albright Decl. ¶ 3).

Ultimately, the County determined that its purchase of vehicles did violate the law, specifically North Carolina General Statute § 143-129. (Financial Report (Ex. I to Pl.'s Br. in Supp.).) The County reported the violation in its Comprehensive Annual Financial Report for the Year Ended June 30, 2015 and to its outside auditing firm. (Id.; Roberts Decl. ¶ 5.) The North Carolina Office of the State Auditor investigated the jail food service contract and the vehicle purchase, though, and declined to issue a report or sanction the County. (Roberts Decl. ¶ 6.)

C.

During this time period, on October 22, 2014, Smith approached Sherry Hook, Alamance County Human Resources Director, and, without explanation[4], asked her to investigate Manning. (Sherry Thomas Hook, 30(b)(6) Designee, Dep. (Oct. 31, 2016) 16:19-20, 18:13-21 [Doc. #53].) Hook did not find the request odd because previously a female employee whom Manning supervised ("Employee 1") had complained to Hook about him, but had requested that Hook not investigate the matter. (Id. 16:20-21, 17:18-24, 23:1-3.) When Hook eventually

---

[4] Alamance County states in its brief in support of its motion for summary judgment that "Smith requested Hook to begin an investigation into comments allegedly made by Plaintiff" and cites Hook's Deposition at page 18, line 13. (Def.'s Br. in Supp. at 4.) However, Hook never testified that Smith requested her to conduct an investigation into the comments Manning allegedly made to co-workers. In fact, Hook answered "No" when asked, "Did David Smith tell you why he wanted to initiate an investigation against Mr. Manning?" (Hook Dep. 22:19-21.)

investigated Manning at Smith's request, (id. 21:20-24), she was reminded of Manning's earlier conduct about which Employee 1 had complained.

Employee 1 was expecting a package to be delivered at work for her September 12 birthday and asked Manning to watch for it. (Ex. A to Hook Decl. (Mar. 29, 2017) [Doc. #42]; Hook Decl. (May 10, 2017) ¶ 3 [Doc. #55].) According to Hook's investigation notes, when Employee 1 returned to work that Monday, Manning asked her if her package contained "edible panties". (Ex. A to Hook Decl. (Mar. 29, 2017).)  She told him to stop, and he laughed it off as a joke. (Id.)  In his deposition, Manning admitted having commented about "edible panties" when someone in the finance office had received flowers. (Manning Dep. 37:2-38:4.)

It was also reported that Manning told Employee 1 and another female whom he supervised ("Employee 2") that he had a potentially offensive joke to tell. (Ex. A to Hook Decl. (Mar. 29, 2017).)  He was told to think hard before he did so, but he told the joke anyway which had something to do with "being mounted". (Id.)  Employee 1 told Manning that he "should have reflected on that a little more" and walked away. (Id.)  Employee 2 also reported to Hook during her investigation that Manning had made inappropriate jokes at work, but none had made her particularly uncomfortable. (Id.)  Employee 3 also reported having heard Manning tell inappropriate jokes in the office. (Id.)  Employee 4 reported that she remembered a few times when Manning told jokes at work that he should not have told, but she was not bothered enough to recall them. (Id.)  Employee 5 told Hook

that she had not heard or seen anything inappropriate from Manning. (Id.)  All of these employees mentioned that the office dynamics had changed considerably since Manning became Finance Officer and that he spent most of his day on the telephone discussing political campaigns. (Id.)

At the close of her investigation, Hook typed her notes, but did not present a copy to Smith or make a recommendation to any Board member. (Hook Dep. 27:24-28:15, 34:2-4.)  She possibly had a conversation with Smith, but she did not recall having done so. (Id. 28:16-19.)

D.

A special meeting of the Board of Commissioners was scheduled for November 6, 2014. (See Minutes of the Special Called Meeting (Nov. 6, 2014) (Ex. C to Answer); Minutes of the Closed Session of the Bd. of Comm'rs (Nov. 6, 2014) (Ex. H to Pl.'s Br. in Supp., Ex. A-2 to Manning Dep., [Doc. #46][5]).)  Notice of the special meeting was posted beforehand, and Commissioner Bill Lashley called Manning inquiring about the topic of the meeting, but, at the time, Manning was not even aware of the meeting. (Manning Dep. 40:7-16.)  Soon afterwards, Manning contacted Commissioner John Paisley who knew nothing about the meeting. (Id. 40:20-22.)  Manning then called Smith, asked if there were questions

---

[5] The Minutes of the Closed Session of the Board of Commissioners on November 6, 2014 are attached as Exhibit A-2 to Manning's Deposition and Exhibit H to his brief in support of his motion for summary judgment and are separately filed as Docket Number 46.  Plaintiff's Exhibit H is the Certified Draft, but the content of all three copies otherwise appears to be identical.

about any of the purchases, and explained that he had processed every payment presented to him. (Id. 42:12-23.) Smith replied that the meeting would not take long. (Id. 42:23-24.)

According to the meeting minutes, the Commissioners moved into closed session "to consider the performance of an employee." (Minutes of the Special Called Meeting.) The minutes of the closed session reflect that the "Board met to discuss a personnel matter involving Tom Manning, Finance Officer which included: inappropriate conduct, an environment of harassment, and political activity during work hours, and refusing to pay checks or order license plates for vehicles." (Minutes of Closed Session.) During the closed session, Hook reported that she had interviewed the finance staff and some voiced concerns about Manning's inappropriate comments. (Id.; Hook Dep. 32:3-9.) Albright was then asked whether this conduct created liability for the County, and his legal opinion was that Manning's conduct could be deemed to have created a hostile working environment. (Minutes of Closed Session; Albright Decl. ¶ 5.) Commissioners Massey and Lashley moved to ask for Manning's resignation, and if he refused to resign he would be terminated. (Minutes of Closed Session.) After Manning entered the closed session, Smith advised him that the Board was asking for his resignation and if he refused, he would be terminated immediately. (Minutes of Closed Session.) Although the minutes of the closed session do not state whether Manning resigned or was terminated, the Minutes of the Special Called Meeting reflect that Smith announced that Manning had submitted his resignation effective

14

immediately and that Vice Chair Lashley, seconded by Commissioner Sutton, moved to accept his resignation, (Ex. C to Answer).

After his separation from the County, Manning received payment for his unused vacation leave. (Ex. D to Answer; Moricle Aff. [Doc. #25]; Manning Dep. 51:15-23).  On April 2, 2015, Manning filed suit against Alamance County alleging breach of contract, the claim for which has since been dismissed, and wrongful termination in violation of public policy. (See Compl.)

III.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).  Alamance County filed its motion first, but without any law on the elements of a claim for wrongful termination in violation of public policy.  Nevertheless, it has moved for summary judgment on the bases that Manning's dismissal was justified, he was not terminated, there were no public policy violations, and Manning failed to follow statutory procedure when he disapproved of the fund disbursements. (Def.'s Br. in Supp. at 6-16.)

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of establishing "the basis for its motion[] and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)[6]).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A dispute is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Id. at 248.  The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. Id.

Although employment in North Carolina is at-will absent a contractual agreement otherwise, there are limited exceptions to this rule, including the public-policy exception which Manning has alleged applies here. Kurtzman v. Applied Analytical Indus., Inc., 493 S.E.2d 420, 422 (N.C. 1997) (citing Amos v. Oakdale Knitting Co., 416 S.E.2d 166 (N.C. 1992), Coman v. Thomas Mfg. Co., 381 S.E.2d 445 (N.C. 1989)).  "Public policy is defined as the principle of law that holds no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." Ridenhour v. Int'l Bus. Machs. Corp., 512 S.E.2d 774, 778 (N.C. Ct. App. 1999); see also Amos, 416 S.E.2d at 168 (describing the public policy issue as "whether defendants' alleged decision to fire

---

[6] Rule 56(c) was amended effective December 1, 2010, but the substance of the rule did not change.

plaintiffs for refusing to work for less than the statutory minimum wage [was] injurious to the public or against the public good").

The public policy exception "is applicable where (1) the public policy of North Carolina is clearly expressed within our general statutes or state constitution, or (2) potential harm to the public is created by defendant's unlawful actions." McDonnell v. Guilford Cty. Tradewind Airlines, Inc., 670 S.E.2d 302, 306 (N.C. Ct. App. 2009). "While there is no specific list that enumerates what actions fall within this exception, wrongful discharge claims have been recognized in North Carolina where the employee was discharged (1) for refusing to violate the law at the employer's request, (2) for engaging in a legally protected activity, or (3) based on some activity by the employer contrary to law or public policy." Combs v. City Elec. Supply Co., 690 S.E.2d 719, 723 (N.C. Ct. App. 2010). In circumstances where an employee is terminated in violation of public policy, there is "a degree of intent or willfulness on the part of the employer", meaning that "the termination itself must be motivated by an unlawful reason or purpose that is against public policy." Garner v. Rentenbach Constructors, Inc., 515 S.E.2d 438, 441 (N.C. 1999) (affirming summary judgment for the defendant when the plaintiff not only failed to forecast evidence that his termination was for an unlawful reason or a purpose that contravenes public policy, but also that the defendant-employer "knew, or even suspected" that it had violated the statute at issue).

"Under the public policy exception, the employee has the burden of pleading and proving that the employee's dismissal occurred for a reason that violates

public policy." <u>Kranz v. Hendrick Auto. Grp., Inc.</u>, 674 S.E.2d 771, 773 (N.C. Ct. App. 2009); <u>see also</u> <u>McDonnell, 670 S.E.2d at 307</u> (requiring that the employee show that "the public policy of North Carolina was contravened when defendant terminated plaintiff from his at-will employment"). More specifically, and relevant here, the employee must prove that he refused to participate in unlawful conduct or conduct which would violate public policy and that his refusal to participate in that conduct was a substantial factor in the employer's decision to terminate him. <u>See</u> <u>Johnson v. Friends of Weymouth, Inc.</u>, 461 S.E.2d 801, 804 (N.C. Ct. App. 1995) (correcting the pattern jury instruction to accurately represent the standard established in <u>Brooks v. Stroh Brewery Co.</u>, 382 S.E.2d 784 (N.C. Ct. App. 1989)). If the employee meets his burden of proof, the employer must then prove that it would have terminated the employee even if the employee had not refused to participate in unlawful conduct or conduct which violated public policy. <u>Id.</u>

The Court will begin its analysis with the County's latter two arguments that apply to Manning's burden of proving that he was terminated, that he refused to participate in unlawful conduct or conduct that violated public policy, and that his refusal to do so was a substantial factor in his termination. The County argues that uncontested evidence – (1) the November 6, 2014 meeting minutes and (2) Manning's acceptance of vacation leave pay – shows that Manning was not terminated. (Def.'s Br. in Supp. at 8.) The County also attempts to head off an anticipated response by Manning by arguing that, because the Board had good cause to believe that terminating Manning was appropriate, his resignation under

18

the threat of dismissal was not a termination. (Id. at 10 (citing Renfrow v. N.C. Dep't of Revenue, 782 S.E.2d 379, 382 (N.C. Ct. App. 2016)).) Despite the County's characterization of this evidence as uncontested, it is not.

The minutes of the closed session of the November 6 meeting do, indeed, state that Manning was offered the opportunity to resign and was told that if he did not resign, he would be terminated. (Ex. H to Pl.'s Br. in Supp.) Later in the minutes, Smith is described as having "firmly communicated to Mr. Manning that he had been offered the option to resign." (Id.) Another set of minutes reflects that "Smith announced that Tom Manning has submitted his resignation effective immediately" which Board members moved to accept. (Ex. C to Answer.) And, Manning's Personnel Activity Form for human resources purposes reflects that he resigned. (Ex. D to Answer; Moricle Aff.)

However, Manning testified that when he entered the closed session of the November 6 meeting, Smith never gave him the option of resigning, but, instead, told him that the Board no longer needed his services and that the Sheriff's deputy would escort him to his office. (Manning Dep. 43:9-17, 44:3-4.) When confronted with the meeting minutes stating that the Board asked for his resignation, Manning matter-of-factly stated, "That did not happen." (Id. 45:3-9.) He denied that Smith "firmly communicated to [him] that he had been offered the option to resign", as had been recorded in the meeting minutes. (Id. 45:17-22.) According to Manning, "there was no discussion of [his] resigning". (Id. 45:23-25.) When asked if he understood what benefits such as unused vacation leave might be payable to an

employee who resigned as opposed to an employee who was terminated, Manning testified that he did not. (Id. 51:15-52:13.)  When the County's Human Resources Director, Sherry Hook, was asked about her attendance during the closed session of the November 6 meeting and whether Manning resigned, she testified, "I do not know." (Hook Dep. 32:3-33:13.)  It is apparent that there is a genuine dispute of material fact as to whether Manning resigned or was terminated.

Alamance County also argues that the contracts about which Manning complained did not violate public policy and that, even if they did, Manning failed to follow proper procedure for disapproving them. (Def.'s Br. in Supp. at 10-16.)  According to the County, the provision of food for the County jail is a service contract not governed by North Carolina General Statute § 143-129's formal bidding requirement, which Manning allegedly admitted in his Complaint when he described voicing concerns over the food service contract. (Id. at 13 (emphasis added); see also Britt Decl. ¶¶ 6-7 (explaining that the Sheriff's Department reached an agreement with Steve's Garden Market to make bulk purchases of foodstuffs at advantageous prices, store the purchased food, and deliver all the component items).)  Whether or not Manning correctly understood the application of the law to the agreement with Steve's Garden Market does not foreclose his claim, and the County has not cited law to the contrary.

Furthermore, pursuant to § 143-129, Manning also challenged the County's purchase of vehicles for the Sheriff's Department, which the County ultimately determined did violate the law.  "Public policy has for many years required

governmental needs to be supplied pursuant to contracts with low bidders ascertained by public advertisement[, and] North Carolina has for many years so provided." Douglas Aircraft Co. v. Local Union 379 of Int'l Bhd. of Elec. Workers, 101 S.E.2d 800, 804 (N.C. 1958) (citing N.C. Gen. Stat. § 143-129). Despite Alamance County's contention that "[n]o cases support the proposition that Plaintiff's actions are the type of activity that is protected by the tort he is alleging", (Def.'s Br. in Supp. at 16), "the purpose of the public contract bidding laws is 'to prevent favoritism, corruption, fraud, and imposition in the awarding of public contracts by giving notice to prospective bidders and thus assuring competition which in turn guarantees fair play and reasonable prices in contracts involving the expenditure of a substantial amount of public money,'" Ronald G. Hinson Elec., Inc. v. Union Cty. Bd. of Educ., 481 S.E.2d 326, 329 (N.C. Ct. App. 1997) (quoting Mullen v. Town of Louisburg, 33 S.E.2d 484, 487 (N.C. 1945) (citing N.C. Gen. Stat. § 143-129)). See also Ridenhour, 512 S.E.2d at 778 (defining public policy as "the principle . . . that . . . no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good").

In addition to Chapter 143's bidding requirements, Chapter 159 explains the disbursement process which requires, among other things, a pre-audit certificate that was allegedly missing from the purchases in question here and that is designed "to assure compliance with [§ 159-28(a), which requires that a budget ordinance contain an appropriation authorizing an expenditure and that there remain a balance sufficient to pay the obligation]". N.C. Gen. Stat. § 159-28(a1).

As Houston had forecasted to Clark, pursuant to § 159-28(e), an officer or employee of a local government who incurs an obligation or pays out or causes to be paid out any funds in violation of § 159-28 is liable, along with his surety on any official bond, for any sums so committed or disbursed.

As explained above, North Carolina defines public policy "as the principle of law that holds no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." Ridenhour, 512 S.E.2d at 778. Not only does the evidence support a finding that the relevant statutes clearly express this public policy in the context of a local government and its finance officer spending public money, see McDonnell, 670 S.E.2d at 306, but a jury could find that Albright's and Smith's actions created potential harm to the public when they insisted that Manning execute the payment for the Sheriff's vehicles despite Albright's apparent knowledge that the County had not followed the law in their procurement, see id. In addition, doing as the County requested could have subjected Manning to personal liability. In sum, despite Alamance County's argument to the contrary, there is sufficient evidence for a jury to find that the County's actions violated public policy.

Alamance County argues, though, that Manning "can't claim public policy protection when he didn't follow public policy himself." (Def.'s Br. in Supp. at 12.) According to the County, pursuant to North Carolina General Statute § 159-28, when Manning, as the Finance Officer, disapproved of a disbursement, the Board could have approved it by a formal resolution with explanation on the record for its

allowance. (Id. at 11.) Instead of having the Board approve the payments to

Steve's Garden Market or Nichols Dodge as the statute provides, Manning

ultimately approved the payments himself and, according to the County, "did not

follow the proper statutory procedure for objecting to what he believed to be a

questionable payment." (Id. at 11-12.) Yet, the County cites no law in support of

its contention that this alleged failure to require the Board to take action in lieu of

his eventual approval of the purchases bars Manning's claim for wrongful

termination in violation of public policy.

Although Alamance County believes summary judgment is appropriate

because of the uncontested evidence surrounding Manning's burden of proof, it

also argues that summary judgment is appropriate "[g]iven the uncontested

existence of a terminable offense." (Def.'s Br. in Supp. at 6.) See Johnson, 461

S.E.2d at 804 (once the employee meets his burden, the burden shifts to the

employer to prove that it would have terminated the employee even if the

employee had not refused to participate in unlawful conduct or conduct which

violated public policy).

In his deposition, Manning admitted to making remarks in the break room

among co-workers about "edible panties". Although Manning does not recall

directing those comments specifically to Employee 1, (Manning Dep. 37:17-19), it

is undisputed that she reported to Hook his having done so after she received

flowers for her September 12 birthday. It is also undisputed that Hook reported

having discovered as part of her October 22 investigation that Manning told

23

inappropriate jokes either directly to or around some members of the Finance Department whom he supervised, although he did not recall at his deposition having made a joke about "being mounted" or having been told that he should have reflected a little more before repeating a particular joke, (Manning Dep. 38:8-13). It is also undisputed that the minutes of the closed session of the November 6 Board meeting reflect that the Board met to discuss, among other things, Manning's inappropriate conduct, a related environment of harassment, and his political activity at work. The minutes also reflect, and Hook recalled at her deposition, that she reported she had interviewed the Finance Department staff, some of whom had voiced concerns over inappropriate comments that Manning made that made them feel uncomfortable. According to the meeting minutes and his declaration, Albright advised the Board that he considered the Finance Department to be a prohibited hostile work environment.

However, it is also undisputed that, at the request of Employee 1, Hook did not investigate the employee's previous complaint. In fact, no investigation of Manning took place until October 22 when, without explanation to Hook, Smith requested that she investigate Manning. Prior to October 22, Clark and Manning had met with Honeycutt to discuss the lawfulness of the vehicle purchase and had worked with Chief Deputy Britt to draft bid requests for the provision of food to the County jail. On October 13, Manning had forwarded to Albright Houston's emails explaining the law applicable to the vehicle purchase, to which Albright responded on October 13 and 14 in disagreement.

After Smith's October 22 request of Hook, Manning received Albright's October 24 memorandum explaining, among other things, that the duties of the Finance Officer did not require or advise making determinations regarding contracts that give rise to invoices. Four days later, on October 28, Smith authored a memorandum to Manning in which he informed Manning that he was aware of Manning's refusal to disburse funds for the vehicles and ordered him to do so. Nine days later, the special meeting was held not only to discuss Manning's inappropriate conduct, an environment of harassment, and political activity at work, but also Manning's refusal to pay checks or order license plates for vehicles. The chronology and context of these events prevents a conclusion as a matter of law that Alamance County would have terminated Manning even if he had not refused to participate in conduct that violated the law or public policy.

In sum, there are genuine disputes of material fact as to whether Manning can meet his burden and, if so, whether Alamance County can meet its burden. Therefore, summary judgment in favor of Alamance County is inappropriate, and its motion is denied.

IV.

Manning argues that he is entitled to summary judgment because his refusal to break the law was a substantial basis for his termination, Alamance County has not presented evidence that it would have terminated Manning had he not refused to break the law, and his damages are supported by undisputed evidence. (Pl.'s Br. in Supp. at 6-13.)

In support of his argument that his refusal to break the law was a substantial basis for his termination, Manning directs the Court to the minutes of the closed session meeting on November 6 that included among the personnel matters to be discussed Manning's "refusing to pay checks or order license plates for vehicles." (Id. at 8-9 (citing Ex. H to Pl.'s Br. in Supp.).)  Claiming that "North Carolina Courts have not defined 'substantial factor'", Manning argues that a reason for termination "need only be one of the factors that led to termination" for it to be considered a "substantial factor" in the decision to terminate. (Pl.'s Br. in Supp. at 10.)  According to Manning, here, "[m]ost significantly, the County's decision to include 'refusing to sign checks' as a reason for [his] termination is itself convincing evidence that Manning's refusal was a substantial factor in his termination" because the law requires that meeting minutes be full and accurate. (Id.)  He also argues he "was terminated almost immediately after the dispute relating [to] the checks came to a head, culminating with Board Chair Smith's directive to Manning to sign the check on October 28, 2014." (Id. at 10-11.)

North Carolina courts have equated the term "substantial" with "motivating" when determining whether a plaintiff's protected conduct was a factor in his termination. See, e.g., Evans v. Cowan, 510 S.E.2d 170, 176 (N.C. Ct. App. 1999) ("[W]e are unable to conclude as a matter of law that plaintiff's statements were the motivating, or substantial, factor behind her termination.").  While there is evidence that Manning's refusal to issue checks for the purchases at issue was a substantial factor in the Board's decision, there is also evidence that any one of

several other issues may have been a substantial factor in the Board's determination. For example, the minutes of the meeting on which Manning relies reflect that not only was the Board concerned with Manning's refusal to pay checks or order license plates, but it was also concerned with "inappropriate conduct, an environment of harassment, and political activity during work hours". More specifically, Hook's investigation into Manning on October 22 revealed that employees he supervised reported that he had made inappropriate comments to them. When Hook reported the results of her investigation at the November 6 meeting, Albright concluded this conduct created a prohibited hostile work environment. In addition, Clark is still employed as the County's Purchasing Manager; yet, he initiated the communications with Houston and Manning about the procurement issues, he appears to have been the primary point of contact with respect to the food purchase issues, and Albright considered him to be much more vocal about the procurement issues than Manning.

Alamance County analogizes this case to Delon v. McLaurin Parking Co., 367 F. Supp. 2d 893 (M.D.N.C. 2005), in which the court granted summary judgment in favor of the defendant-employer because the uncontroverted evidence showed that the plaintiff made no effort to report any illegal activity to his supervisors or to any state or federal agency before he was terminated. The County argues that because Manning did not raise his concerns to the full Board to whom he reported, but instead took his concerns to other members of the "Management team", his claim is foreclosed. (Def.'s Br. in Opp'n at 8-9 [Doc.

#54].)  This case is distinguishable from <u>Delon</u> where the plaintiff maintained a notebook of complaints that he failed to share with his supervisors until after he was terminated.  Here, on the other hand, Manning did not keep his concerns about the legality of the food and vehicle purchases between Clark and himself. Instead, he spoke with the Chief Deputy about the food purchase and worked with him to develop requests for proposals that the then-Board Chair ultimately overrode.  He and Clark met with the County Manager to discuss their concerns about the purchase of the vehicles.  Manning and the County Attorney exchanged detailed correspondence about the legality of those purchases before the then-Board Chair directed Manning to issue the check for the vehicles.  Even the County Attorney acknowledged that he refused to take these issues to the full Board because they were matters best addressed by the County Manager and the Sheriff. Although North Carolina General Statute § 159-28 provides a procedure by which a disapproved invoice may be paid, and Manning apparently chose not to follow that procedure, it cannot be said that he failed to report his concerns of unlawful conduct to individuals other than his co-worker Clark.  Instead, he reported his concerns to the Chief Deputy of the Sheriff's Department, the County Manager, and the County Attorney before receiving directives from the then-Board Chair.

However, whether Manning can meet his burden of proving that he was terminated and that his refusal to issue the checks in question was a substantial factor in his termination involves disputed questions of material fact for the jury determine.

Even if the Court could answer those questions on summary judgment, it cannot be said as a matter of law that the County has failed to meet its burden of showing that it would have terminated Manning even if he had not challenged the food and vehicle purchases. Manning once again directs the Court to the minutes of the November 6 meeting which he argues are inconsistent with the County's position that it would have terminated Manning regardless of his refusal to disburse funds, because they refer to Manning's refusal to sign checks. (Pl.'s Br. in Supp. at 11.) He also argues that the nine days between Smith's directive to Manning to issue the check for the vehicles and his termination as compared to the "nearly two months" between his inappropriate comments to Employee 1 and his termination, along with the fact that the Board had never previously addressed his inappropriate comments, are evidence of the County's true intention. (Id. at 12-13.) As explained above, though, there are genuine disputes of material facts as to whether the County would have terminated Manning even if he had not challenged the food and vehicle purchases. For example, the extent of Manning's inappropriate comments to employees whom he supervised was not discovered until Hook's October 22 investigation and, once reported to the Board, Albright advised that Manning's conduct created a prohibited hostile work environment.

In sum, there are genuine disputes of material fact as to whether Manning can meet his burden and, if so, whether Alamance County can meet its burden. Therefore, summary judgment in favor of Manning is inappropriate, and his motion is denied.

Manning is correct in asserting that "Alamance County has not forecasted any evidence to contest [his] calculation of his damages." (Pl.'s Br. in Supp. at 13 (citing Ex. L to Pl.'s Br. in Supp.).)  However, because summary judgment is not appropriate on the issue of liability, the issue of damages is best determined at trial.

V.

For the foregoing reasons, IT IS HEREBY ORDERED that Alamance County's Motion for Summary Judgment [Doc. #39] is DENIED.  IT IS FURTHER ORDERED that Thomas K. Manning's Motion for Summary Judgment [Doc. #47] is DENIED.

This the 22nd day of June, 2017.

/s/ N. Carlton Tilley, Jr.<br/>Senior United States District Judge